[No. 25136. Department Two. December 14, 1934.]

GEORGE NELSON, *Appellant*, v. THE CITY OF SEATTLE
*et al., Respondents and Cross-Appellants.*[1]

[1]Reported in 38 P. (2d) 1034.

2

4

*Herald A. O'Neill, Edwin H. Flick,* and *Stanley Kent,* for George Nelson.

*A. C. Van Soelen* and *Glen E. Wilson,* for City of Seattle.

*Edwin C. Ewing* and *Ryan, Desmond & Ryan,* for Vigilant Towing Co. *et al.*

*Allen, Froude & Hilen,* for S. A. Moceri, Inc.

*Elder and Nievinski,* for Galbraith & Co. *et al.*

BLAKE, J.—This litigation arises out of what is popularly known as the second Denny hill regrade, in Seattle, being specifically described as local improvement district No. 4818. Generally speaking, the improvement consisted of the removal of the remainder of Denny hill which had not been included in the first regrade. Particularly, the plans called for the regrading of streets to a new datum, the laying of water mains and sewers, paving of alleys, and the paving, sidewalking and curbing of streets.

Bids were called for upon the project in its entirety. The plaintiff herein, George Nelson, was the successful bidder. On September 14, 1928, a formal contract was entered into between him and the city for the entire work. The contract was made subject to the general plans and specifications adopted by the board of public works for use on public improvements and cer-

tain special specifications contained in the contract itself.

Nelson entered into subcontracts with the defendants Vigilant Towing Company and S. A. Moceri, Inc., for various parts of the work to be done under his contract with the city. To understand the part performed by each, it is first necessary to describe in a general way the plan adopted by Nelson for carrying out the work to be performed.

Under his contract with the city, Nelson was required to dispose of all waste material. Anticipating, however, the difficulty of disposing of such a vast quantity of earth, the city had, prior to calling for bids, obtained from the War Department of the United States a permit to dump the waste material into Elliott bay. The method of transporting the waste material from the point of excavation in the regrade district to the place of dumping in the bay was as follows:

A stationary belt conveyor was established in three sections. The first section extended along Battery street from Fifth avenue to Third avenue; the second section extended along Battery street from Third avenue to Railroad avenue; the third section extended from Railroad avenue to a point on the Wall street dock, or pier No. 12. In the regrade district, there were several portable belt conveyors from a hopper at Fifth avenue and Battery to various points in the regrade, as required by the progress of excavation. As the earth was excavated, it was deposited on the lateral or portable conveyors, and carried thence to the hopper at Fifth avenue and Battery street. From the hopper, it was deposited on the stationary conveyor and carried to a hopper on the Wall street dock. By means of a chute, the waste material was taken from this hopper onto scows, by which it was carried to the dumping place in the bay.

The only part of the work required under his contract with the city that Nelson performed himself was the transportation of the waste material over the conveyor system to the Wall street dock. All the rest of the work, he sublet to others, all of whom are parties to this action, with one exception. That is Nevada Contracting Company, which will be hereafter referred to simply as "Nevada."

Nevada is not a party to this litigation, but since it will be referred to from time to time, it is necessary to make a brief reference to its subcontract under Nelson. Under its contract, Nevada was required to remove all earth, debris and waste material, and deliver the same onto the belt conveyors, and subgrade the streets and alleys to a grade within one and one-half inches of the datum established by the city.

To the defendant S. A. Moceri, Inc., which will hereafter be referred to as "Moceri," Nelson sublet the contract for the laying of water mains and sewers, paving, sidewalking and curbing.

With Vigilant Towing Company and others, who will be hereafter referred to as "Vigilant," Nelson entered into a contract for the transportation of earth and waste material from the hopper on the Wall street dock to the dumping point in Elliott bay.

Nelson entered into a lease with Wall Street Dock Company (which was wholly owned by defendant Galbraith & Company, and which for brevity will hereafter be referred to as "Galbraith"), whereby he obtained the

"  . . . privilege of extending his belt conveyor, its supporting structure and its operating and discharging machinery westerly from the corner of Railroad avenue and Battery street along the south margin of the Wall street dock for such distance as may be to him convenient."

When the entire work under the Nelson contract with the city had been completed, controversies existed between the several parties over settlements. These controversies resulted in the present litigation, which comprises, in reality, several different lawsuits, which, for convenience of discussion, we shall designate as follows: Nelson v. City of Seattle; Moceri v. Nelson; Vigilant v. Nelson; Galbraith v. Nelson and Vigilant.

Issues were made up between the parties, as indicated, upon the various points in dispute. After trial on the merits, the court made findings of fact and entered judgment determining the rights of the various litigants upon all the points of dispute raised by the pleadings. All parties have appealed from one phase or another of the judgment. Since the points on appeal have been very succinctly presented by counsel for the various litigants, we shall not attempt to make a statement of the issues raised by the pleadings, but shall proceed to discuss the disputed questions raised by the various appeals in the order above indicated.

NELSON v. CITY OF SEATTLE.

Between Nelson and the city there are three items in dispute: (a) Payment for removal of houses within the regrade area; (b) payment for raking and grading parking strips; (c) payment of salaries of inspectors placed on the scows by the city to supervise the dumping of waste material into Elliott bay.

(a) In cutting the streets to the new grade, slopes encroached on the abutting lots—in many instances to such an extent as to undermine dwellings and outbuildings thereon. The contract provided for the payment to Nelson of two hundred dollars for the removal, under order of the city engineer, of such houses as had in excess of two hundred fifty square feet of floor space. All other buildings in the regrade district Nelson contracted to move under an item in his bid

designated as "clearing." Three houses in excess of two hundred fifty square feet of floor space were moved by Nelson under order of the engineer and paid for by the city at the contract rate. In this action Nelson sought to recover for the removal of some two hundred of such houses, at two hundred dollars each. The trial court allowed him $4,800 for the removal of twenty-four such houses. Nelson and the city both appeal from the judgment in this respect.

What gave rise to this phase of the controversy was that, with the consent of both Nelson and the city, house wreckers went in and tore down the houses and removed all valuable material, leaving on the site of the houses nothing but a pile of debris, consisting of lath, plaster and roof wreckage. It is for removal of this debris that Nelson seeks recovery, on the theory that they were houses under the provision of the contract providing for the payment of two hundred dollars each for the removal of houses. The court, however, held that such debris did not constitute houses, as contemplated by that provision. It held that Nelson was required to remove such debris under the provisions of the contract relating to "clearing." Those provisions are as follows:

"The district to be cleared will be the entire area included within the margins of streets and alleys and areas covered by all slopes whether in excavation or embankment.

"All old sidewalks, planking, cross walks, curbs and gutters, box drains or other rubbish or worthless material and all roots, grubs and other debris in the district or encountered during the progress of the work shall be piled and burned or otherwise disposed of to the satisfaction of the City Engineer."

■ ■ The correctness of the court's conclusion seems to us too plain for argument. As a matter of fact, Nelson almost concedes it himself, for he asks in

the alternative that he be allowed the reasonable cost of removal of the debris of such houses on the theory of *quantum meruit*. Of course, recovery on *quantum meruit* is permissible only where the work done is not provided for in the contract. *Strong & MacDonald v. King County*, 147 Wash. 678, 267 Pac. 436. Since the contract provides for the removal of such material, Nelson cannot recover any additional amount on *quantum meruit*.

■ The city's cross-appeal from the judgment allowing Nelson $4,800 for the removal of twenty-four houses presents to us a more difficult problem. The provisions of the contract relating to clearing contain the following clause: "All boulders, concrete, brick and stone *from structures* of every description shall be hauled away and disposed of."

The twenty-four houses for which the court allowed Nelson compensation consisted of brick or concrete foundations in place. The superstructure had been removed and wrecked, but the foundations had not. We gather from the record that the court was of the view that the sentence of the contract last quoted did not cover brick or concrete foundations in place. The sentence is susceptible of such construction, in view of the two words which we have italicized. In any event, the sentence is ambiguous as to the point here involved. Since the contract was prepared and drawn by the city, we think the trial court was correct in solving the doubt against the city.

■ (b) Bids were called for, subject to standard plans and specifications adopted and published by the board of public works. Section 152 thereof contained the following provision:

"All parking strips shall be graded on a true plane from the new curb to the existing portion of the parking strip. Parking strips shall be finally cleaned

and raked and roadways cleaned up, not later than ten (10) days after street is open to traffic.''

The call for bids contained certain special specifications, among which was an amendment to § 152 of the standard plans and specifications. This amendment contained the following provision: ''Payment shall be made for 'Grading Parking Strips' at the price bid per linear foot . . .'' The call for bids, however, did not contain any item for the grading of parking strips. Nor did Nelson submit a bid therefor. The special specification providing for the payment for grading parking strips by the linear foot was omitted from the formal contract thereafter entered into between Nelson and the city. It appears that the contract was prepared in the city engineer's office, and that the persons drafting the contract omitted the special specification without the knowledge of either Nelson or the board of public works.

We think it is a fair inference to say that both Nelson and the board of public works assumed that all special specifications contained in the call for bids were included in the formal contract. The city entered into the contract solely through authority vested in the board of public works. Neither the city engineer nor anyone in his office had power to change or modify any of the terms contained in the call for bids.

Controversy arose between Nelson and Moceri over this item. In entering into his contract with Moceri, Nelson obtained a copy of the special specifications from the city engineer. Supposedly these were identical with the special specifications contained in Nelson's contract with the city. The special specification relating to payment for grading parking strips was contained in the specifications so obtained from the engineer's office, and went into the Nelson-Moceri contract.

Obviously, the special specification was omitted from

the contract between Nelson and the city through the mutual mistake of Nelson and the board of public works. Therefore, the contract should be deemed to be reformed so as to include it. With the contract so reformed, the grading of parking strips constituted extra work, for which Nelson is entitled to reasonable compensation. On this item, the court allowed Moceri, as against Nelson, the sum of $3,324. By the same token, Nelson should be allowed the same amount as against the city.

■ (c) During the progress of the dumping of waste material in Elliott bay, officials of the War Department notified the city that the terms of the permit were not being complied with by the contractor. It will be recalled that this phase of the work was sublet to Vigilant Towing Company by Nelson. Vigilant failed to comply with the terms of the permit as interpreted by the officials of the War Department. The city, fearing the permit might be revoked, placed inspectors aboard the tugs to see to it that Vigilant complied with the permit. The salaries of these inspectors amounted to $1,454, which the city paid. However, as a condition to making final settlement with Nelson, the city required him to reimburse it in that amount. The court allowed Nelson recovery in this amount against the city. The city appeals from this portion of the judgment.

It will be recalled that Nelson's contract with the city required him to dispose of waste material coming from the regrade. The city was merely a volunteer in procuring from the War Department the permit to dump it in Elliott bay. Of course, it was to the interest of both Nelson and the city to so dispose of the waste dirt, because in no other manner could it have been handled at the price of Nelson's bid. The city, however, retained no supervisory right to control the

method or manner of wasting material from the regrade. If the permit should have been revoked, the problem of disposing of waste in some other manner would have been up to Nelson. It is apparent that, in such case, he would have been unable to dispose of waste material, and would consequently have been unable to carry out his contract. The city would then have been relegated to an action of damages for the breach.

Anticipating such a contingency, the city voluntarily chose the alternative of putting inspectors on the tugs to insure compliance on the part of Vigilant with the terms of the permit. There was nothing in the Nelson contract that authorized such a procedure. The expenditure was one which the city voluntarily incurred primarily for its own protection. While it incidentally was of benefit to Nelson, it was a charge for which he was not legally liable to the city under his contract.

With respect to the items at issue between Nelson and the city of Seattle, the judgment will be affirmed, except as to the item of grading parking strips. On that item, Nelson will have judgment against the city for $3,324.

MOCERI v. NELSON.

On this appeal, three items are involved: (a) Grading of parking strips; (b) tying in of new with old pavement at street ends; (c) subgrading claimed to have been done by Moceri.

(a) As we have seen, the court allowed Moceri recovery against Nelson in the sum of $3,324, on account of grading parking strips. We do not think it necessary to add anything here to what we have said with respect to Nelson's claim against the city on this item.

(b) Many of the streets in the regrade district had been paved prior to the commencement of work on

the project. In such instances, it was necessary to break up the old pavement at the street ends of the re-grade district and connect the new pavement up with the old. This work did not come under Moceri's contract with Nelson. During the progress of paving, however, he had done much of such work, for which he had received extra compensation. Toward the completion of the job, there remained seven of such street ends where it was necessary to connect up the new pavement with the old. Moceri did the work. The question is whether he has been compensated for it.

It is conceded that he has not been paid in money. It is claimed by Nelson that Moceri agreed to do the work as consideration for the use of a McMillan scraper belonging to Nelson. It is conceded that Moceri used the scraper for one hundred twenty-five or one hundred thirty days, and that the rental value of the scraper was ten dollars per day. Moceri, however, asserts that Nelson agreed to let him use the scraper without making any rental charge therefor. The trial court found that Moceri agreed to do the work on the street ends in question in consideration of the use of the scraper, and entered judgment accordingly.

Aside from the inherent improbability of one contractor loaning another, free of charge, a piece of equipment having a rental value of ten dollars a day, we think the preponderance of the evidence supports the finding of the trial court. While the witnesses called by Moceri support his version of the transaction, there is a course of conduct on his part disclosed by the record which convinces us that he did not expect pay in money for the work done on these particular street ends. On all the other work at street ends which Moceri did, he kept an account of it and submitted a bill for it when each street end was completed. With respect to the work on the seven street ends in ques-

tion, Moceri admits that he never did present any bill to Nelson. The inference that we draw from this course of conduct is that, until the controversy arose over the final settlement, Moceri did not expect to be paid in money for work on these street ends.

(c) Under his contract with Moceri, Nelson was obligated to bring the subgrade of streets within one and one-half inches of the datum established by the city. After the pavements were down and the work finally completed, Moceri for the first time laid claim to extra compensation for excavation and filling made necessary, as he alleged, by the failure of Nelson to bring the subgrade within one and one-half inches of the datum. He claims that, on some streets, he was compelled to fill, and on others excavate virgin earth, in order to establish the fine grade required for laying the pavement.

In passing on the issue, the court indicated his belief that Nelson (or Nevada, which had the subcontract for subgrading) had not brought the subgrades on some streets within one and one-half inches of the fine grade required for paving. The court held, however, that it was purely conjectural, under the evidence, as to how much filling and excavation was done by Moceri. Consequently, he disallowed Moceri's claim for extra compensation for subgrading.

The oral testimony on the issue is conflicting, and, for the most part, comes from interested witnesses. Depending upon that alone, we should hesitate to disagree with the view expressed by the trial court, to which we have alluded. There is a circumstantiality in the testimony of certain witnesses who testified for Nelson on the issue that seems to us more convincing than the testimony of Moceri's witnesses. This, coupled with certain other facts which are not disputed, con-

vinces us that the evidence preponderates with Nelson on this issue.

Here, again, we turn to Moceri's own conduct and his methods in handling the work and his accounts. It will be remembered that Moceri's contract called for the laying of sewers and water mains. After Nevada finished with the excavation and subgrading, Moceri went in and dug trenches for the sewers and water mains. After the mains and sewers were laid, there were large quantities of earth that had come from the trenches which could not be backfilled. It was, of course, necessary for him to remove such surplus earth from the streets, in order to lay pavements. It is while removing such surplus earth from the trenches that he claims he did the subgrading for which he now makes claim. Yet he made no attempt to segregate costs, time of men, or time of equipment, put in on the subgrading, from the costs and time of men and of equipment put in on fine grading and the removal of trench earth. Furthermore, in his Federal income tax report, he included all such costs as a part of expense of operation under his contract with Nelson. And on top of it all, he never, during the progress of the work (except in an instance when he was paid extra), made to the city, Nelson, or Nevada, any protest as to the condition in which the subgrade was left by Nevada. This, notwithstanding the following letter written to him by Nelson:

"S. A. Moceri, Inc.          September 23rd, 1930

"In order to avoid misunderstandings, we must request you not to move any of your equipment into any streets or alleys unless you are satisfied that same are to proper grade.

"The fact of your moving any equipment into any area will be considered by us as your acceptance of grades and our responsibility will cease.

"When you are not satisfied as to correctness of

grades the matter must be taken up before you start to work.

"Your acknowledgment of this letter is requested.
                            "Yours truly
                            "GEORGE NELSON
                            "By A. Lincoln, Supt.
    "As requested by your Mr. Davis, we are from now on subgrading 1½″ high to leave you some material for backfill."

The letter was acknowledged by J. A. Davis, Moceri's superintendent on the work, who affixed his own and Moceri's initials to it.

The judgment of the trial court will be in all respects affirmed on the issues raised on the appeals between Nelson and Moceri.

VIGILANT v. NELSON

It will be remembered that Nelson entered into a contract with Vigilant whereby the latter was to load the waste material onto scows and dump it into the bay. There are several items of dispute between Nelson and Vigilant growing out of this phase of the operation.

█ The first to be considered is a claim by Nelson against Vigilant for $10,073, on account of dredging in Elliott bay, which the former was required to do by the city and the War Department. Under the permit, as originally granted by the War Department, the dumping area extended along the water front from University street on the south to Denny way on the north. To the west, it extended one thousand feet from the shore line. The permit contained the further limitation that material must be deposited at a depth not less than sixty-four feet below the plane of mean lower. low water. The contract between Nelson and Vigilant contained the following provision:

"It is further understood and agreed that as part consideration of this contract, parties of the first part (Vigilant) will before this contract shall be effective,

furnish a bond to be executed by the United States Fidelity and Guaranty Company in the amount of $67,000, conditioned for the faithful fulfillment of this contract, and further conditioned to hold parties of the second part (Nelson) harmless from any and all acts of negligence on the part of first parties or their employees, and from any and all claims of damage to, or interference with shipping along the water front, and from any and all claims on the part of the Government of the United States for failure to abide by and comply with the requirements of said permit of the War Department.''

About a year after the commencement of operations, representatives of the War Department made complaint to the city that material was being deposited in places in the bay at lesser depth than prescribed in the permit. This occurred in May, 1930. These complaints were passed on to Nelson, and by him to Vigilant. A second and third complaint came from the War Department, which resulted in the establishment of a new area for dumping along the water front between Broad street and Denny way, and extending out from the shore line approximately two thousand feet. This occurred in September, 1930. At about the same time, the city put inspectors on the scows to see that the terms of the permit were complied with. From then on, there was no further difficulty on that score.

Nelson, however, was required to move forty thousand yards of material within the original dumping area, at a cost of some ten thousand dollars. The material so moved was from two shoals in the area described in the original permit. One of these shoals had its origin in the deposit of material from the Washington hill and first Denny hill regrades, some twenty-five years before. A survey of the bottom of Elliott bay in 1911, after those regrades were completed, showed that the bottom of the bay had been raised to a depth of forty-four feet, as a result of accumulations

of material from those projects. In December, 1930, another survey was made, which showed that the floor of the bay had been raised in the shoal area above the forty-four foot depth. It also showed a new shoal in the same vicinity. In one place, the depth in this new shoal area was only twenty-seven feet. The forty thousand yards of material which Nelson was required to move brought the depth of water in the shoal areas back to forty-four feet.

The court found that the new shoal and the accretions to the old shoal were due to negligence on the part of Vigilant, in that proper and sufficient soundings were not taken at the places where waste material was deposited. Allowance therefor was made Nelson against Vigilant in the sum of $10,073.

Vigilant contends that the evidence to support this finding "is very meager, and is entirely circumstantial." It is obvious that the evidence is circumstantial, since there was no one at the bottom of the bay to see where the dumped material settled. That it is meager, we cannot agree. On the contrary, we think it is of such a character as to demonstrate that the new shoal and the accretions to the old shoal could have come from no other source than the material dumped in the bay by Vigilant.

In the first place, according to the clear preponderance of the evidence, as we read it, the shoal areas were within the general courses followed by the tugs after they pulled away from the Wall street dock with the loaded scows. In the second place, the shoal areas were at the approximate distance from the dock as would require, under the evidence, the time taken to make a round trip from the dock to the dumping place during the first year of operation. It was only after 2,500,000 yards of material had been dumped in the bay that it was discovered that the deposits had reached

a point near enough the surface to imperil navigation. This was discovered by Captain Johnson, of Vigilant, who observed that the propellers of a steamer leaving the Bell street dock (near which the shoals were located) had stirred up sediment to such an extent as to muddy the water. We think it is apparent from his testimony that he was disturbed by the discovery, and that he then believed that the shoal water was the result of the dumping of regrade material into the bay.

The trial court was of the opinion that, if daily soundings had been made by Vigilant, this situation could have been avoided. There was ample area within the grant of the permit to have taken care of all the regrade material at a depth not less than sixty-four feet below the plane of mean lower low water. But during the first year, sufficient soundings were not taken by Vigilant. Its failure to do so, in our opinion, amounted to negligence, for which it and its surety were liable to Nelson under the provision of the contract which we have quoted.

The new dumping area established by the War Department in September, 1930, lay entirely to the north of Broad street. It necessitated a much longer trip by the scows, both in distance and in point of time. Theretofore, it had required but twenty to twenty-five minutes to make a round trip. Now it required forty to forty-five minutes or more. Up to this time, Vigilant, in compliance with the terms of its contract, had kept two scows and one tug on the job. This equipment had been sufficient to receive the material as it had been brought down on the dock by the belt conveyor. But with the additional distance to go, it was necessary to put another tug and another scow in service.

An oral agreement was entered into a few days prior to September 30, 1930, whereby Nelson agreed to pay one-half the rental of the additional tug and to allow

Vigilant the use of a scow, rent free, which he owned. The parties acted on this agreement on September 30th. Vigilant put on the additional tug and put Nelson's scow in service. Thereafter an attempt was made to reduce the oral agreement to writing. The attempt was unsuccessful, however, because Nelson injected into the proposed writing other controversial questions existing between them. The tug and scow were continued in service to the end of the job—Nelson paying one-half the rental of the tug.

On this issue, Nelson claims the reasonable value of the use of the scow and recoupment of the amount of rental paid by him on account of the tug. Vigilant, on the other hand, seeks to recoup the amount it paid in rental for the tug. The trial court held with Nelson, allowing him $1,824 for the use of the scow and $1,425 on account of rent of the tug. This was on the theory that the longer haul (and consequent necessity for additional equipment) was due to Vigilant's failure to comply with the original permit from the War Department. This, as we have seen, is true, and there is no doubt that, had Nelson stood on his original contract with Vigilant, the latter would have had to furnish the additional equipment. But, for reasons unnecessary to state here, Nelson was anxious to have the work progress with as great speed as possible. Hence his proposal to pay half the rental of the additional tug and allow Vigilant the use of the scow without charge. Vigilant having acted upon the oral agreement, Nelson could not thereafter withdraw from it. We think the court erred in allowing Nelson $1,824 for the use of the scow and $1,425 for rent of the tug.

We fail to find any basis in the record for Vigilant's claim for reimbursement for rent of the tug paid by it. As we have seen, in the absence of the oral agreement, it was obligated under its original contract to furnish

all necessary equipment. But for the oral agreement, the entire cost of the tug and scow would have been chargeable to it.

The next claim by Vigilant, upon which a vast quantity of evidence was introduced, is one which, it seems to us, merits scant consideration. It is for the wages of ''loaders''—men who manipulated the chute through which the debris passed from the conveyor to the scows. The crux of the question is where, under the contract, Nelson was to deliver the debris and Vigilant was to receive it. Vigilant contends that delivery was to be made by Nelson *on the scows*. Nelson contends that Vigilant was to take delivery *at the chute*. It was necessary to have men on the dock to manipulate the chute. If delivery was to be made *on the scows*, obviously the obligation to employ and pay loaders would be on Nelson. Likewise, it is obvious that, if delivery was to be made *at the chute*, the obligation would be on Vigilant.

The contract is not clear on the subject. But for the interpretation placed on the contract by the parties—particularly Vigilant—the problem might offer considerable difficulty. Vigilant, however, assumed the obligation from the beginning; but, it says, only at the behest of Nelson and upon his promise to pay the loaders' wages. Nelson, of course, denies any such agreement. And from the record, we do not believe any such agreement was made.

Vigilant further endeavors to pin the charge on Nelson on the ground that towing custom requires nothing of the tug but to receive the cargo; that, under the custom, it is the duty of the shipper to deliver the cargo on the scow and the duty of the consignee to unload it. The weakness of this position is that, under the contract, it was clearly Vigilant's obligation to deliver the cargo at the bottom of the bay. And as we

have indicated, it assumed from the beginning the obligation of taking the debris from the chute. It hired, fired and paid the loaders without consulting Nelson. Although Vigilant sought advances from Nelson on account, from time to time during the progress of the work, it never made any claim on Nelson for loaders' wages. Admittedly, the first that Nelson learned of this claim was when Vigilant filed its claim with the city against his bond. Finally, Vigilant charged wages of loaders as an expense of operation in its income tax report. In the face of this conduct, we think that Vigilant can hardly claim that, under the contract, it was Nelson's duty to deliver the debris on the scows.

Nelson's contract with the city required him to complete the job within seven hundred twenty days from notice to commence work. That contract was entered into September 14, 1928. The contract between Nelson and Nevada was executed March 29, 1929. It provided Nevada should commence work on or before June 14th, upon twenty days notice from Nelson. It was stipulated that Nevada would complete the work of excavation in three hundred days from the time work was commenced. In order to complete the excavation in that period of time, it was necessary for Nevada to deliver on the belt conveyors a minimum of 14,400 cubic yards daily.

Nelson and Vigilant entered into their contract March 5, 1929. This contract was also predicated on the assumption of the moving of 14,400 cubic yards daily. For the contract provided for a lump sum payment to Vigilant of $66,900. It provided that the services of Vigilant should be continuous for one year after work commenced, and contemplated complete performance in three hundred working days. It further provided that, if after the expiration of a year

there was still material to be moved from Denny hill, Vigilant would continue the services for $70 a day.

It is agreed that the work commenced June 10, 1929. It is also agreed that the last material was dumped in the bay on December 9, 1930. Thus the contract extended one hundred fifty-two days beyond the year stipulated. Nelson has paid Vigilant $70 per day for the extended period. Vigilant, however, contends that it is entitled to recover from Nelson the reasonable value of the services rendered for the extra one hundred fifty-two days. Such reasonable value, Vigilant contends is $225 per day. Nelson contends that Vigilant was bound, under the contract, to continue the services at $70 a day, as stipulated, and that, in any event, the amount claimed by Vigilant as the reasonable value of the services is excessive. The trial court found that Vigilant was entitled to recover the reasonable value of its services for sixty-two days; that the reasonable value was $129 per day.

The problem presented is difficult, both from the standpoint of law (or rather the construction of the contract) and fact.

At first blush, it would seem that Vigilant's obligation was clear to continue the service of the tug and scows beyond the period of one year without limitation. But we are confronted with the provision of the contract requiring Vigilant to stand ready with equipment sufficient to receive and dispose of 14,400 cubic yards of material a day. We think the record shows that Vigilant fulfilled this obligation. Now, although the contract did not specifically so provide, there was a reciprocal obligation on Nelson to deliver 14,400 cubic yards of material to Vigilant. 1 Page, Contracts (2d ed.) § 583; *Ehrenworth v. Stuhmer & Co.,* 229 N. Y. 210, 128 N. E. 108; *Parks v. Elmore,* 59 Wash. 584, 110

Pac. 381; *Lloyd v. American Can Co.,* 128 Wash. 298, 222 Pac. 876.

Had Nelson substantially fulfilled this reciprocal obligation, no doubt Vigilant would have been required to continue its service at $70 a day to clean up the job. But Nelson did not, during the year stipulated, even approximate the delivery of 14,400 cubic yards a day. It was estimated that there were 4,200,000 cubic yards to be moved. After a year's work, not to exceed 2,700,000 yards had been moved. It is not conceivable that Vigilant intended, or that Nelson expected, that the former would for half a year longer perform a service for $70 a day upon which he had bid at the rate of $225 a day. So it would seem to follow that, in so far as performance by Vigilant was delayed beyond one year through Nelson's failure to deliver 14,400 yards of material a day, the former would be entitled to recover the reasonable value of its services. On this theory, a great volume of evidence was introduced by both parties. Needless to say, it is utterly irreconcilable, both with respect to Nelson's responsibility for delays and in his failure to deliver 14,400 cubic yards of material a day, and as to the reasonable value of Vigilant's services during the extended period.

The trial court did not accept the theory of either party on either the amount of the delay attributable to Nelson or the reasonable value of Vigilant's services. It allowed Vigilant for sixty-two days at $129 per day. Vigilant assigns error, claiming that the allowance, both as to time and reasonable value of service, is inadequate. As to the time element, we agree with Vigilant; as to the reasonable value, we agree with the trial court.

The difficulty in fixing responsibility for delays is apparent when we recall that there were three separate

operations: The excavation by Nevada; transportation of material from hill to dock by Nelson; and dumping by Vigilant. Only by perfect coordination in the three operations could the Nevada and Vigilant contracts be completed within three hundred days. And there was rarely perfect coordination—sometimes due to fault on the part of Nevada, sometimes due to fault of Nelson, sometimes due to fault of Vigilant, and sometimes due to factors over which none of the parties had control. Nevada might have insufficient shovels both in number and in power. Shovels would break down; the belt conveyor system would bog down; scows would upset and go out of commission.

The city complained to Nelson of delay. Charges and counter-charges as to responsibility for it were constantly being interchanged among Nevada, Nelson and Vigilant. Each kept records as to causes of delay. These records kept by the three were picked up daily by Harry C. Scott, inspector on the work for the city. From these records, he reconciled the delays for various causes, allocating the amount of delay chargeable to each as appeared from such records to be the result of breakdowns in their respective operations. From these records, there appeared a certain amount of delay that was due to factors over which none of the parties had control. Summed up, his testimony showed that 130.1 days were lost through delays. Of these, 42.1 days were charged to Nelson; 51.4 days were charged to Nevada; 22.1 days were charged to Vigilant; and 14.5 days of delay were found to be due to factors over which none of the parties had control.

We use these findings of Mr. Scott, because, to our minds, they are the result of computations by a disinterested witness made at the time from daily records of the interested parties. We think the results obtained by him are the only basis upon which responsi-

bility for delays can be fairly fixed with any reasonable degree of certainty. His computations are competent, under *Pacific Tel. & Tel. Co. v. Huetter,* 68 Wash. 442, 123 Pac. 607.

Now, as between Nelson and Vigilant, Nelson was responsible for delays caused by Nevada. So we have 93.5 days delay for which Nelson was responsible to Vigilant. But there is an offset to be made of 22.1 days for which Vigilant was responsible to Nelson. The net result is that Nelson's failure to deliver 14,400 cubic yards of material a day, as contemplated by the contract, caused a delay of 71.4 days to Vigilant, for which Nelson was responsible.

In arriving at this result, we have not overlooked Nelson's contention that, taking into consideration the expansion of dirt when removed from place, he in fact delivered to Vigilant a daily average of 14,400 cubic yards of loose dirt. The contracts, however, contemplated the measurements of dirt in place in Denny hill. The contract with Nevada, fixing three hundred days as the period required for excavation, was arrived at on the basis of 4,200,000 cubic yards to be removed. It is not conceivable that Nelson, in entering into the contract with Vigilant, ever thought that Vigilant could acquit its obligation by the daily removal of 14,400 cubic yards of loose dirt. For, by his own testimony, dirt removed from place increases thirty to forty per cent in volume. On this theory, Vigilant would have had to handle approximately 5,400,000 cubic yards of material in the same period that Nevada handled 4,200,000 cubic yards. It is hardly to be supposed that, had Nevada excavated, and Nelson delivered, 14,400 cubic yards from place, Vigilant would have been heard to say that it contracted to dump only 14,400 yards of loose dirt. Nelson's answer,

doubtless, would have been: "Put on more equipment, as your contract provides."

Nor have we overlooked Nelson's contention that one tug and two scows were insufficient to handle 14,400 cubic yards a day. That may or may not be so. It is immaterial on this phase of the case, because, during the year, Nelson's deliveries did not tax the capacity of Vigilant's equipment.

Vigilant complains because the court allowed only $129 per day on account of the delays. Vigilant claims that it is entitled to $225 per day. Vigilant's testimony does not appeal to us as entitled to much credit upon this question. Two hundred twenty-five dollars per day would have been Vigilant's daily rate of earnings under the lump sum bid ($66,900) had the work been completed in three hundred days, as contemplated. That bid was made in February or March, 1929. The services on overtime were performed in the last half of 1930. Obviously, there was a vast difference between what would constitute reasonable value for such services in the first half of 1929 and the last half of 1930.

Then, too, in reading the testimony of Vigilant's witnesses who testified that $225 per day was reasonable, we cannot help but feel that they divided $66,900 by three hundred, and then strained every item entering into costs, with the endeavor "to build up" to the figure of $225 a day. For instance, they included in their figures the cost of the two scows—approximately $27,000. These, however, being special equipment, had been completely written off in Vigilant's bid of $66,900. Vigilant was a partnership. In making up their figures, witnesses for Vigilant included some $7,000 as salaries for the partners. And on top of that, they allowed fifteen per cent on cost for profit.

We think the trial court was perfectly justified in ignoring this testimony. We arrive at approximately

the same figure as the trial court did, but by a different method. Take Vigilant's evidence of labor and operating cost at $80 per day. Add to that the reasonable rental of a tug at $35, which, under the evidence, is a liberal allowance for an unmanned tug. Then allow fifteen per cent (the going rate on city contracts) for profit. The result is $132.25. The difference in our result and the trial court's is so slight that we shall not disturb its finding as to reasonable value. We conclude, therefore, that Vigilant is entitled to recover $129 per day for 71.4 days, less $70 per day which it has already been paid by Nelson.

Vigilant assigns error to the allowance by the trial court of interest on $10,125 from November 18, 1931. That is the date Nelson paid for the dredging of the shoals. The theory of the allowance of interest was that payment for the dredging made the claim a liquidated one against Vigilant, since the payment made was the reasonable cost of the dredging. We do not so view it. The question of liability and the reasonable cost of dredging was still open to contest after the payment was made by Nelson. The claim was unliquidated, and, therefore, interest was not allowable on it until it was reduced to judgment. *Wright v. Tacoma*, 87 Wash. 334, 151 Pac. 837.

As will hereafter appear, Nelson was held liable to Galbraith for $1,508, on account of damages to the Wall street dock. Of this amount, the court found $1,128 to be due to negligence of Vigilant, but did not enter judgment in favor of Galbraith against Vigilant, since there was no privity of contract between them. The court did, however, enter a judgment in favor of Nelson against Vigilant and the United States Fidelity and Guaranty Company in that amount, conditioned on Nelson's having to pay (and paying) Galbraith.

The United States Fidelity and Guaranty Company executed, as surety, a bond guaranteeing to Nelson the faithful performance by Vigilant of its contract. Error is assigned that judgment should not have been entered against the surety. The reason given is that the bond was not an indemnity bond. The point is not elaborated in argument. Having examined the bond, we fail to see any merit in the point.

GALBRAITH v. NELSON AND VIGILANT.

As we have seen, Nelson entered into a lease with the Wall Street Dock Company for the use of pier 12, which was owned by Galbraith. The lease contained the following:

"Provided payments of rentals are made as above indicated, this lease shall continue in effect until terminated as hereinafter provided. The lessee shall notify the lessor in writing not less than 30 days before date intended for termination of its intent to terminate the lease and shall remove the entire structure to be erected under the rights and privileges leased above, returning the existing dock structure with its shed as nearly as practicable to its present condition, all at the expense of the lessee. When this removal of the conveyor structure and the return of the other property to its original condition shall have been accomplished not less than 30 days following the lessee's notice of intent to terminate, this lease shall terminate and rental payments shall cease. But rental shall continue until thirty days after notice by the lessee of intent to terminate and for such further period as the lessee shall continue to occupy or use any part of the premises, or shall fail to remove any structure herein required to be removed or shall fail to return any part of lessor's property to its original condition."

In December, 1930, Nelson gave notice of termination of the lease. Shortly thereafter, he vacated, removing the superstructure of the conveyor system. It

is claimed by Galbraith, however, that he failed to return the property in its original condition. In one respect, it is admitted that he did not. At the time the lease was entered into, the water alongside the dock had a depth of thirty feet. When the work was completed, the water had a depth of only eighteen feet at the points where the scows were loaded. This resulted from the spilling of waste material as it was transferred through the chute from the conveyor to the scows, and also from upset of scows before they were towed away from the dock. This condition, however, was remedied by Nelson in the fall of 1931, after suit was instituted, but before trial. By dredging, he restored the depth of the water to thirty feet. There is no evidence that, in the meantime, Galbraith suffered any damage by reason of the decrease in the depth of water. On the other hand, the evidence is to the effect that the water was deep enough to accommodate all vessels that sought berth at the dock.

The trial court allowed Galbraith nominal damages on account of Nelson's failure to sooner restore the slip to its original depth. The point to be noted with respect to this phase of the controversy between Galbraith and Nelson is that, at the time the notice of termination of the lease was to become effective, the premises had not, in this respect at least, been restored to their original condition.

Galbraith also claimed $2,705 damages against Nelson and Vigilant for injuries to the dock structure. In October, 1929, on two different occasions, scows upset, breaking and damaging certain piles and caps. In order not to interrupt the progress of the regrade work, Galbraith consented to repairs at that time which admittedly did not put the dock into as good condition as it was before. Nelson admitted it would take $1,131

to restore the dock to its original condition. The court, on conflicting evidence and after viewing the dock, found that the reasonable cost of restoring it to its original condition was $1,508. Judgment was entered against Nelson in that amount. Although it found that $1,128 of that amount was occasioned by negligence on the part of Vigilant, the court refused to enter judgment against the latter in favor of Galbraith on this item.

Galbraith, on this appeal, assigns error to the court's finding as to the amount of damages, and its conclusion that Vigilant was not liable, at least to the extent of damages resulting from its negligence. The latter assignment is, in our opinion, untenable in law. The action against Nelson arose from contract; that against Vigilant sounded in tort, for there was no privity of contract between Vigilant and Galbraith. We know of no authority, and none has been cited, which warrants the joinder of causes of action against two different persons where action against the one arises *ex contractu* and the action against the other arises *ex delicto*.

As to the first phase of the assignment—the amount of damages awarded as against Nelson—we find nothing in the record that would warrant us in overturning the finding of the trial court. As we have said, it was made on conflicting evidence and after a personal examination of the dock. As the trial court remarked, Nelson's obligation was not to build a new dock but to restore an old dock to its original condition.

Galbraith makes another contention which presents a more difficult problem. It is to be noted that, under the undisputed facts, the leased premises had not been restored to their original condition either at the time the notice of termination of the lease was

given by Nelson or at the time the notice was designed to become effective. Galbraith contends, therefore, that the notice was ineffectual to terminate the lease in the absence of prior performance on the part of Nelson of his covenant to make repairs and restore the premises to their original condition. In other words, he contends that the obligation on the part of Nelson to make repairs and to restore the premises were conditions precedent to his right to terminate the lease; that, consequently, the lease was not terminated and Nelson was not released from his covenant to pay rent. Galbraith, therefore, contends that he is entitled to recover the rent stipulated until the repairs are made and the premises restored to their original condition. In support of this contention, he cites the following cases: *Pope v. Abbott,* 211 Mass. 582, 98 N. E. 512; *Shear v. Healy,* 121 Misc. Rep. 218, 200 N. Y. Supp. 770; *Cahill v. Eastman,* 18 Minn. 324, 10 Am. Rep. 184; *Bunch v. Williams,* 76 Ark. 102, 88 S. W. 588; *Diepenbrock v. Luiz,* 159 Cal. 716, 115 Pac. 743, L. R. A. 1915C, 234, Ann. Cas. 1912C, 1084; *Stait v. Fenner,* 2 Law Reports, Chancery Division (1912), 504; *Burch v. Farrows Bank, Ltd.,* 1 Law Reports, Chancery Division (1917), 606; *Simons v. Associated Furnishers, Ltd.,* 1 Law Reports, Chancery Division (1931), 379.

The American cases cited simply hold that a lease, terminable on notice, cannot be determined without performance of conditions precedent. None of them involve stipulations such as we have here under consideration, namely, agreements to make repairs and restore the premises to the condition they were in at the time of demise.

The English cases, however, deal expressly with just such stipulations, and hold them to be conditions precedent. They are all actions by the lessor for rent after notice of termination by the lessee. They hold that

notice to terminate by the lessee, in the absence of waiver or estoppel on the part of the lessor, is ineffectual unless agreement of the lessee to make repairs has been fulfilled before the effective date of the notice.

The case of *Burch v. Farrows Bank, Ltd., supra,* presents a striking illustration of the extreme to which the doctrine has led the English courts. There the lessee gave notice of termination in accordance with the terms of the lease; commenced, but did not complete, the repairs before the effective date of the notice. Thereafter, the lessee continued in possession *only for the purpose of completing the repairs.* Yet the court held that, the condition precedent not having been performed, the notice was ineffectual to terminate the lease. And that was a twenty-one year lease, terminable by the lessee on notice only at the expiration of the third, seventh and fourteenth years of the term.

There could hardly be more explicit expression of intent to create a condition precedent than in the lease before us. Reverting to its terms:

"But rental shall continue until thirty days after notice by the lessee of intent to terminate *and for such further period as the lessee . . . shall fail to return any part of lessor's property to its original condition.*"

. If this were merely an action for stipulated rent, we should have no difficulty with the problem. The rule of the English cases could be easily applied. But there is also included an action for damages on the covenant to make repairs and restore the premises to their original condition. The general rule is that a covenant to make repairs is not breached until the expiration of the term. Therefore, an action on the covenant does not lie until the term ends. 1 Taylor's Landlord and Tenant (9th ed.), § 361.

The question arises, then, as to whether the action on

the covenant to make repairs is consistent with the action for rent. It seems to us the logic of the situation answers no. Galbraith had one of two alternatives when Nelson gave the notice of termination. He could either ignore it, insist on performance of the condition precedent and collect rent until it was performed, or he could waive performance of the condition precedent and sue on the stipulation as a covenant to make repairs. He attempted to do both, but he must be held to one. Since the action on the covenant could be maintained only on the theory that the term of the lease was determined, and the action for rent only upon the theory that the term was still subsisting, we think that Galbraith must be held to have waived the performance of the condition precedent. This view is consonant with the doctrine of the English cases. In *Stait v. Fenner*, 2 Law Reports, Chancery Division (1912), 504, the court said:

"There is one other point I ought to mention, because it has been strongly urged. It is said that in some way or other there has been a waiver on the part of the lessors to insist upon the invalidity of the notice—at all events upon any ground other than that of the want of title on the part of the person to give the notice. Having paid the greatest attention to the arguments, I fail to see how there can have been a waiver. Waiver depends upon a course of action inconsistent with the right asserted. . . . I think therefore that the plaintiffs succeed in showing that the term is still subsisting, and that they are entitled to a declaration to that effect and to the costs of the action."

Since the action for damages on the covenant to make repairs is inconsistent with the theory that the term was still subsisting, Galbraith must be held to have waived the performance of the obligation as a condition precedent.

The judgment of the trial court is affirmed on all phases of the controversy between Nelson and Galbraith.

The cause is remanded, with directions to modify the judgment in the particulars we have indicated.

BEALS, C. J., TOLMAN, HOLCOMB, and GERAGHTY, JJ., concur.