[No. 33007. Department One. April 26, 1955.]

CHARLES W. HOPKINS, *Appellant*, v. THOR P. ULVESTAD *et al.*, *Respondents.*[1]

[1] Reported in 282 P. (2d) 806.

*Ralph B. Potts,* for appellant.

*Robbins & Robbins,* for respondents.

DONWORTH, J.—This action was brought to foreclose a lien for labor and material furnished in the construction of the foundation of a house in the amount of $837.48. The trial court held that certain items claimed were not chargeable to the defendant because plaintiff was simultaneously engaged in the performance of two contracts; that as to the balance of the items the lien should be foreclosed; that the defendant should be allowed to set off against the recovery on the lien certain damages suffered by reason of poor workmanship; that the plaintiff should be allowed an attorney's fee of one hundred fifty dollars; and that neither party should recover costs. Findings of fact and conclusions of law were made, and judgment was entered in favor of the plaintiff for $173.70 plus the attorney's fees.

Plaintiff has appealed from the judgment and has assigned error to all material portions of the findings of fact, conclusions of law, and judgment.

The situation presented is quite different from the usual

lien foreclosure proceeding and requires a somewhat detailed statement of facts.

Thor P. Ulvestad and wife desired to construct a family dwelling upon a lot they owned in the city of Seattle. Mr. Ulvestad, a practicing attorney, shall be referred to as though he were the sole respondent. He planned to do much of the work on the proposed dwelling himself and thereby greatly reduce the usual cost of construction.

In his endeavor to hold down costs, respondent contemplated the making of several separate contracts: (1) he retained an architect to draw plans for the house but not to supervise the construction; (2) he contracted with a bulldozer operator to excavate the lot; (3) he arranged with another party to supply and dump fill dirt; (4) he entered into a contract with two carpenters (hereinafter referred to as the partnership) to set foundation forms and frame the house; (5) he contracted with an acquaintance to pour the foundation and basement cement work; and, in addition, he made several other separate contracts for the furnishing of different materials as required throughout the progress of the work. There was no general contractor or other representative of the owner to supervise the work done on the premises.

The lot upon which the dwelling was to be erected was not level. The street forms the west boundary. Along a portion of the south boundary it was near street grade, but it sloped downward until it was about twenty feet below the level of the adjoining lot on the south. At about the center of the lot was a level area which was some twenty feet below street grade. From this level portion the lot sloped downward to the north and east boundaries.

The architect drew plans for a three-level dwelling which would utilize the natural terrain of the lot. Respondent, working alone, cleared the lot of trees, brush, and undergrowth. Fill dirt was dumped and leveled on the north side of the lot. The bank on the south side of the lot was then excavated to the property line by a bulldozer. The architect's plans called for the location of the house eleven feet and four inches from this boundary.

The evening that this excavation was completed (January 7, 1953), Mr. Jory, the owner of the property adjoining respondent's lot on the south, telephoned respondent and advised him that as the result of this excavation a slide had occurred, and that he feared that his house would become undermined because of the removal of lateral support. At the time of the trial of this case, a suit was pending which had been instituted by Mr. Jory against the respondent here to recover for damages to his property resulting from this removal of lateral support.

Respondent inspected the reported slide and found that a tree, about a truck load of dirt, and some eight feet of rockery had slipped into the excavation from Jory's lot. The surface of Mr. Jory's lot was then about twenty feet higher than the adjacent part of respondent's property. Upon the advice of an engineer respondent attempted to restore the lateral support the next day by causing some eighty yards of sand to be dumped into the excavation and graded up against the bank. The slide ceased.

The foregoing events took place two months before appellant ever was on the respondent's property. Appellant started to work on March 12, 1953, as a subcontractor for the partnership under the circumstances described below.

The partners, called as witnesses by respondent, testified that in making their contract with the owner they had allowed five hundred dollars to cover the cost of placing the forms for the cement work. The only excavating they were to do under that contract was such hand-shovel work as would be incidental to the leveling of the forms. The partners desired to sublet the work of placing the forms to a subcontractor because they did not have form panels and were not familiar with the work of placing such panels. They contacted appellant at the site of a job where he was then working and asked him if he could rent panel forms and set them in place for five hundred dollars.

The partners testified that they had advised appellant that in making their contract with the owner they had allowed five hundred dollars for putting the forms in place, and that if there were any additional cost, appellant would have

to look to the owner. Appellant drove by respondent's lot on a Sunday, observed its condition and terrain, and later telephoned the partners that he estimated that the cost of placing the forms would not exceed five hundred dollars. The partners then requested him to start work immediately.

Appellant was furnished the architect's sketch showing the location and general character of the proposed house. This plan called for the setting of the basement walls on solid footing. On March 12, 1953, he proceeded to stake out the basement. It was then that he discovered that an excavation two or three feet wide and forty feet long would have to be made in the sand bank on the south side of the lot in order to place the forms according to the plan. Appellant procured a bulldozer operator, who was working in the vicinity, to make· the necessary excavation of the south bank. (Respondent later paid the bulldozer operator for this work.) Appellant and his crew then started to use hand shovels to dig for a firm level footing for the south wall forms. The bank started sliding down faster than the crew could shovel. In an attempt to hold the bank, appellant drove a large number of two-by-fours into the ground and nailed shiplap to them, forming a temporary retaining wall. Shortly after this wall was in place, a further slide occurred which completely buried it.

When this emergency arose, appellant and respondent had their first contact in regard to the work which appellant was doing and was to do on the property.

Appellant telephoned respondent and advised him that because of the sliding tendency of the bank, it was impossible to put in the forms according to plan and suggested two alternatives. One was to place the house farther to the north and away from the south bank. Respondent would not consent to this suggestion. Appellant then advised respondent that the only other way in which the house could be located according to plan would be to build a small footwall of reinforcing steel and quick-setting cement at the toe of the slope to hold the slide temporarily. Then, after this footwall was in place, the south foundation wall, which would also require reinforcing steel and quick-setting cement, should be

built upon it. In order to give this foundation wall strength to withstand the pressure of the bank, the other foundation walls for this part of the structure should be poured and tied-in immediately. This deviation from the plan would locate the south basement wall about a foot north of the planned location and would result in the basement walls being eight feet, instead of seven feet, in height. Appellant told respondent that the cost of construction would be increased because of these changes in plans, materials, and construction procedure.

Respondent testified that he told appellant to put in the footwall and that he would pay him extra for it. Appellant testified that respondent told him to do anything necessary to keep the bank from sliding and to get the house built.

During the next three days and nights, appellant set the forms with reinforcing steel in place and poured the concrete for this footwall and for the foundation walls for the upper tier of the basement. Much of this work was done after dark. The slide condition continued throughout the time required to finish the upper tier, and, as a result, the south wall, which is about forty feet in length and eight feet in height, has a one and one-half inch bow in it.

During the ten days required to complete this work (from March 12th to March 22nd), respondent inspected the progress of the work at least once each day. During this period, respondent made no protest of any kind concerning the character or amount of work which appellant was doing. No further slides occurred at any time after March 12, 1953.

When the work was completed, appellant rendered his statement for the entire job. Respondent requested him to segregate his charges into (a) expense of installing the footwall and (b) expense of setting the forms. Appellant told respondent that such a breakdown was impossible, and that, even if it were accomplished, it would represent only a portion of his total bill, because the work he did on the project was far more than merely the setting of forms and pouring the footwall. Respondent paid appellant five hundred fifteen dollars (which was the amount the partnership

had allowed for setting the forms in its contract plus sales tax). He also paid for most of the materials used by appellant. Appellant billed respondent for the remainder of the account for labor and certain other material items. Not receiving payment, appellant filed a claim for a labor and materialman's lien and, after attempts to agree upon the balance payable were unsuccessful, commenced this action to foreclose the lien.

Respondent's answer denied that appellant had a contract with respondent, and denied that respondent owed appellant anything on the lien claim. In his cross-complaint, respondent alleged that appellant had a contract with the partnership for *excavation work*, and that the excavating was done in a faulty, improper, and unworkmanlike manner, which in turn resulted in defects appearing in the structure later placed upon the foundation constructed by appellant.

It is appellant's contention that he has worked on but one contract; that he was not required to excavate under his contract with the partnership; that, before he had an opportunity to commence performance of the contract of placing the forms for the partnership, an emergency arose as the result of which he entered into a new contract of much larger scope directly with the owner; that it is upon this contract with the owner that he bases the lien claim which is here sought to be foreclosed and contends that respondent should pay the reasonable value of the service rendered under that contract.

In the main, we agree with appellant's contention.

At the close of the trial, the court found that there was no error or padding in the compilation of the total labor expense claimed by the appellant in the amount of $806.90, and that such expense was not excessive but rather was reasonable in view of the difficulties encountered in the performance of the work.

Appellant testified that his form panels rent for six cents per square foot, and that this is the usual rental charged in

the area. At that rate, the rental on the 2,444 square feet of form paneling used on this job amounts to $146.64.

Most of the materials used by appellant were either furnished by respondent or were ordered by appellant and paid for by respondent. Respondent testified he had paid all the bills (for material) sent to him and was willing to pay for all materials used in the project. Therefore, appellant is entitled to be reimbursed by respondent for cost of those materials set forth in the claim of lien, which were procured and paid for by appellant and proven to have been expended in the work. These items, totaling $121.16, include two-by-fours and shiplap buried in the slide, $29.50; lumber for blockouts, $4.40; nails, $4.80; snapties, $28.00; strapties, $5.20; steel, $41.76; and wheelbarrow rent, $7.50.

Appellant testified that normally on a "cost plus" project he contracts for a ten per cent profit plus a six per cent overhead. The trial court allowed the charge of ten per cent for profit but nothing for overhead. There was testimony of an experienced builder that both of these charges are usual and reasonable. The only contrary testimony was that of the partners—two carpenters who had only entered into four building contracts in their lives.

The evidence on this issue preponderates against the finding, and we feel that the trial court erred in disallowing the six per cent for overhead. Appellant should, therefore, be allowed ten per cent profit and six per cent overhead, computed on the basis of the total labor expense.

The trial court allowed appellant an attorney's fee of one hundred fifty dollars, recognizing that this was not adequate but holding that the fee was in keeping with amount finally recovered. In view of the amount of preparation required in this case, the total time appellant's counsel was required to be in attendance on the court, and the increase in the amount recovered in this court, we believe that three hundred dollars is a reasonable attorney's fee. Appellant should be allowed recovery of an attorney's fee in that amount.

In his brief, appellant asks this court to fix the amount of an attorney's fee for services on this appeal. We have recently reiterated our rule that we will not do so in lien foreclosure cases. *Haugen v. Raupach*, 43 Wn. (2d) 147, 260 P. (2d) 340. The trial court has jurisdiction to fix such fee and may do so at any time, notwithstanding the pendency of an appeal. We, therefore, decline to rule on this matter.

The lien claim includes an item for cartage of panels from the project to the appellant's yard at the end of the job. The trial court properly denied recovery of this item. The evidence fails to support a separate recovery of this item but indicates that this expense was included in the six per cent overhead item.

In his complaint, appellant prays for interest on the amount of the lien claim computed from the date of the filing of the lien. The trial court properly refused to allow this item. This is not a case involving a promise to pay for labor and material at an *agreed rate* and thus capable of being referred to as a "liquidated" claim. It is rather a case involving an implied promise to pay at a *reasonable rate* for labor and material furnished, and hence is an "unliquidated" claim. *Fowler v. Gray,* 141 Wash. 372, 251 Pac. 570, *Mall Tool Co. v. Far West Equipment Co.,* 45 Wn. (2d) 158, 273 P. (2d) 652. Until judgment is entered in such a case, there can be no liquidated claim, and hence no interest runs thereon prior to judgment. *Nelson v. Seattle,* 180 Wash. 1, 38 P. (2d) 1034.

As previously indicated, the cross-complaint alleged defective and improper workmanship in excavating, resulting in damage to the house as finally erected. Neither in his contract with the partnership, nor with respondent, was appellant required to do any excavating. In support of his cross-complaint, respondent produced evidence to show certain defects in the cement foundation and in fastening the frame of the house upon the foundation. The evidence shows that, after appellant finished pouring the foundation, the partnership framed the house pursuant to their contract

and the respondent himself finished the interior of the dwelling. Neither under his subcontract with the partnership nor under his subsequent contract directly with the owner was appellant obligated to set the plates to which the frame of the house was to be fastened. That was the obligation of the partnership.

Respondent never complained to appellant about this matter during the progress of the work, although he was on the ground at least once each day during this period. There was evidence that a portion of the cement center seam or "rat wall" had dropped between a sixteenth and an eighth of an inch since its construction. This wall is less than a foot high. Respondent testified that, when excavating, he had the area leveled to a surface that was as hard as concrete. It is upon this ground that the center seam was placed. Under the circumstances, its settling cannot be attributed to defective workmanship on the part of appellant, nor is he responsible for any defects which have appeared in the floors, walls, or doors of the superstructure.

■ Framing and finishing the house was not a part of appellant's contract, and he performed no work on these phases of the construction. Since appellant was in no way connected with the framing and finishing of the house, either in workmanship or materials, we conclude that respondent has failed to prove a cause of action on his cross-complaint and should take nothing by it. The trial court erred in holding appellant responsible for these alleged defects and in allowing respondent one hundred seventy-five dollars damages under his cross-complaint.

■ As stated above, respondent inspected the progress of appellant's work at least once each day during the period that appellant was performing work under the oral contract between them. He knew, or should have learned from these inspections, that appellant was doing far more than merely building a footwall and placing forms. Never did he notify appellant to stop doing work which was obviously beyond the scope of the contract which respondent claims existed between them. Respondent was content to accept the bene-

fits of appellant's work, which included not only the installation of the foundation walls of the house but also the prevention of further removal of lateral support from Mr. Jory's property. Failure to accomplish the latter would have left respondent subject to a much larger claim for damages than Mr. Jory was already asserting against him in the pending suit. As a lawyer, respondent must have been fully aware of this. On March 12th, he told appellant to do whatever was necessary to stop the second slide and get the foundation of the house completed, and then stood by for ten days observing, without a word of protest, the amount and nature of the work which appellant was doing. Under the undisputed facts of this case, we hold that respondent should pay the reasonable value of the labor and materials as set forth below.

The evidence preponderates against the findings made by the trial court to the effect (a) that appellant contracted to set the forms "at the agreed price of $500.00," (b) that the additional expense incurred as a result of the excavation of March 12, 1953 "was the obligation of plaintiff," and (c) that appellant "ordered certain materials without authorization from defendant."

The evidence adduced in support of the cross-complaint also preponderates against the finding made to the effect that the work performed by appellant "was done in an unsatisfactory manner, and that substantial damage resulted to the defendant's home by reason of such work."

To summarize, we hold that appellant is entitled to recover judgment against respondent in the amount of $721.28, being the total of the following items:

| | |
|---|---|
| Labor expense | $806.90 |
| Ten per cent profit | 80.69 |
| Six per cent overhead | 48.41 |
| Panel rent | 146.64 |
| TOTAL | $1082.64 |
| Three per cent sales tax | 32.48 |

| | |
|---|---|
| Reimbursement for materials furnished | 121.16 |
| TOTAL | $1236.28 |
| Less payment received | 515.00 |
| BALANCE | $721.28 |

In addition thereto, appellant shall be allowed recovery of the $1.85 lien filing fee, an attorney's fee of three hundred dollars, and his taxable costs in both courts.

The judgment is reversed, and the cause remanded to the superior court with directions to enter judgment and provide for the foreclosure of appellant's lien in accordance with the views expressed herein.

HAMLEY, C. J., SCHWELLENBACH, FINLEY, and ROSELLINI, JJ., concur.

June 18, 1955.   Petition for rehearing denied.